UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
JUAN D. MARROW,

                Plaintiff,                    **REPORT AND RECOMMENDATION**

    -against-                                  06 Civ. 13681 (SCR) (GAY)

JOHN E. POTTER, POSTMASTER GENERAL,

                Defendant.
------------------------------------------------------------------X

TO THE HONORABLE STEPHEN C. ROBINSON, United States District Judge:

      Juan D. Marrow brings this action under the (1) Civil Rights Act, 42 U.S.C. §§ 2000e to 2000e-17 ("Title VII"), 1981, and 1983; (2) Employee Retirement Income Security Act of 1974 ("ERISA"), Pub. L. No. 93-406, 88 Stat. 829 (codified as amended in scattered sections of 26 U.S.C.); and (3) New York State Labor Law (N.Y. Labor Law §§ 1-911), Civil Rights Law (N.Y. Civil Rights Law §§ 1-90), and Human Rights Law (N.Y. Exec. Law §§ 290-300) [collectively, hereinafter "New York State Laws"].[1] Plaintiff Marrow asserts these claims against defendant John E. Potter, Postmaster General, for allegedly terminating his employment for discriminatory reasons. Presently before this Court is defendant's motion to dismiss plaintiff's claims pursuant to Rule 56(c) of the Federal Rules of Civil Procedure ("FRCP"). For the reasons that follow, I respectfully recommend that defendant's motion be GRANTED.

---

      [1] Plaintiff filed his Complaint as a *pro se* litigant. He later retained an attorney, as discussed set forth *infra* note 2. Accordingly, the Court limits its review of plaintiff's claims to the three causes of action enumerated in his Complaint, namely: (1) Title VII disparate treatment; (2) ERISA; and (3) "New York State Laws."

**I. BACKGROUND**

The following facts are gathered from the parties' pleadings; defendant's substantiated statements pursuant to Rule 56.1 of the Local Civil Rules of the United States District Courts for the Southern and Eastern Districts of New York ("Local Rule 56.1"); and defendant's affidavits, affirmations, exhibits in support of his contentions. As of the date of this Report and Recommendation, plaintiff has not filed any papers in opposition to defendant's motion.[2]

Plaintiff is a black male who was born on July 9, 1953. He began his employment as a custodian with the United States Postal Service ("USPS") at least as of January 1981. He resigned from his employment at the USPS on April 29, 1994. On May 2, 1994, plaintiff was charged with one count of larceny and theft for stealing property used by the USPS. On February 22, 1995, plaintiff pleaded guilty to a misdemeanor charge. He was sentenced, in substance, to three years of probation and fifty hours of community service.

Plaintiff returned to the USPS in March 1997 as a full-time custodial laborer in the Processing and Distribution Center ("P&DC") in White Plains, New York. The custodial staff worked in "tours." The tours describe shifts and are referred to as Tour 1, Tour 2, and Tour 3. The custodial staff reports directly to a tour supervisor. The tour supervisors report to their respective tour manager of maintenance operations. Said managers report to the maintenance manager at the P&DC.

---

[2] Antoinette L. Williams appeared on behalf of plaintiff by letter dated March 14, 2008. Docket #9. On February 5, 2010, the undersigned granted Ms. Williams request for an extension of time to February 8, 2010 to file plaintiff's opposition to the present motion. Docket #30.

Plaintiff received training each time the USPS hired him. He also received an employee handbook. From said training and handbook, plaintiff understood that he (1) was required to protect and conserve federal property; (2) could only use federal property for authorized activities; and (3) could not uses his position for private gain.

At one point, around 1997 or 1998, Hugh McCauley supervised the custodial staff. In or around 2005, four tour supervisors oversaw the custodial laborers: Michael Annechino, Barbara Belton, James Lamake, Bob Boyer and/or Joe Zezuto. The male tour supervisors are white. Ms. Belton is black. Gregory Kubis was the Tour 2 manager of maintenance operations. Beginning in April 2005, Kubis reported to Michael Singer, who was the maintenance manager at the P&DC. Both Kubis and Singer are white males.

At least as of 2005, plaintiff worked on Tour 2 with fellow custodial laborers, Nicholas Ceglio, Jr.[3] and Robert Raus. Their job duties included cleaning the cafeteria dining area at the P&DC. Typically four custodians cleaned the cafeteria together. Two people cleaned tables, one would dry mop the floor, and another would empty the garbage from the receptacles in the cafeteria dining area. The person who emptied the garbage would reline the receptacles with supplies from the custodial department.

A private contractor, Aramatic Refreshment Services ("Aramatic") ran the food services at the cafeteria. Marrow, Ceglio, and Raus understood from McCauley's instructions that the custodians were to provide Aramatic with trash bags, Windex, or anything else, if needed. Aramatic voluntarily gave the USPS custodians a free cup of

---

[3] Ceglio was also a shop steward of the union. In part, shop stewards help fellow employees with grievances.

coffee or soda on days that they cleaned the dining area.  However, Aramatic entered into a contract/order modification with the USPS effective from April 1, 2004 through March 31, 2007.  Pursuant to said agreement, Aramatic was responsible for its own supplies to maintain and sanitize the concession area.  Moreover, Aramatic was contractually responsible for maintaining the dining area of the cafeteria.  The USPS was contractually responsible for cleaning all exterior windows.

In addition to cleaning the cafeteria, the custodial laborers' duties included high dusting.  Said task required a person to use a lift to dust the ceiling on the third floor.  Anyone who used the lift individually was required to be trained on the lift.  Anyone who rode the lift, whether individually or with someone else, was required to have a physical medical examination.  Custodial laborers who performed the high dusting duties received extra compensation for said work.  However, plaintiff allegedly did not receive said extra compensation when he performed the high dusting.

Plaintiff requested said compensation from his supervisor, Kubis.  Kubis denied plaintiff's request.  Plaintiff contends that Kubis treated him differently than other employees because he was black, and possibly due to his age.  Plaintiff submits that Kubis "displayed . . . favoritism toward African females and hostility to black males."  Plaintiff complained about Kubis' behavior to other custodial workers, but not to a supervisor.  Plaintiff also asserts that white employees received better treatment in that (1) they did not get reprimanded for coming to work late; (2) supervisors allowed them to decline performing high dusting duties; and (3) if they cursed at each other, no one would be reprimanded.  Non-white employees, however, did not have the same

liberties. Plaintiff does not know of any specific instance demonstrating preferential treatment towards white employees, or negative treatment towards black employees.

After Kubis denied plaintiff extra compensation, plaintiff filed a grievance. The outcome of his grievance was that Singer denied plaintiff the extra compensation. Thereafter, plaintiff contends that Singer started "messing with" him, asking him to perform tasks that he was not "supposed to be doing." He also contends that Kubis was "saying things about [him]" to Singer "about the food and bags and everything." However, plaintiff did not actually hear Kubis say anything to Singer. He further contends that Singer treated him unfairly in retaliation to the complaints plaintiff made about Kubis' treatment of black women versus black men. Plaintiff makes said assertion based on his understanding that Singer and Kubis were very close friends. Again, however, plaintiff did not hear or see anything that led him to believe Singer retaliated against him.

In or around August of 2005, Kubis was subject to an investigation for alleged misconduct at the USPS. As a result, he was criminally charged with embezzling approximately $300,000 from the USPS. On August 11, 2005, Kubis admitted to submitting false invoices, was arrested, and was suspended with pay.[4]

Thereafter, plaintiff contends that Singer "piggyback[ed]" on Kubis' animus towards him. Plaintiff contends that Singer asked him, but no one else, to perform tasks outside the scope of the custodial job duties. He also asserts that Singer paid other

---

[4] On October 7, 2005, Singer issued a proposed notice of removal to Kubis and he resigned. Kubis pled guilty to the criminal charges against him in February 2006, and was sentenced to eighteen months in jail in June 2006.

5

custodians a higher compensation than him.  Plaintiff surmises that he was subject to different treatment because he is black.

Plaintiff believes that Singer treated him differently because of his race based on information his co-workers conveyed to him.  Allegedly, sometime in 2004 or 2005, co-worker Orlando Mendoza told plaintiff that Singer did not like black men.  In 1997, another co-worker, Mike Washington, told plaintiff to "watch out" for certain people because they do not like black people.  Washington allegedly referred to Singer and Lamake.  However, plaintiff does not recall any instance where Singer said anything about or to him regarding his race or age.

On August 30, 2005, an anonymous person made several accusations, via letter, against employees at the P&DC.  Included among the accusations was that plaintiff stole USPS supplies to trade with Aramatic for free food.  The anonymous accuser stated that plaintiff's supervisors knew about and consented to said exchange.  Plaintiff believes that Kubis drafted the anonymous letter.

Two special agents from the Office of the Inspector General ("OIG") investigated the accusations against plaintiff from August 5, 2005 to October 21, 2005.[5]  From said investigation, the OIG agents learned that plaintiff had an arrangement with the Aramatic cafeteria manager, John Kolitsopovlos.  Specifically, plaintiff would supply gloves and garbage bags to Kolitsopovlos in exchange for discounted food.  Plaintiff

---

[5] OIG reports state that the covered period of investigation began on August 5, 2006.  Decl. of Michael Singer, Exs. 2-3 [hereinafter "Singer Decl."].  One report states that the OIG received allegations of plaintiff's food/supplies exchange on August 5, 2006.  Singer Decl., Ex. 3.  It is unclear whether there were two separate complaints against plaintiff or whether either the August 5 or August 30 date is a typographical error.

admitted that he provided gloves and garbage bags in exchange for discounted food. Kolitsopovlos also admitted that the exchange had been going on for six months prior to the investigation. Subsequently, the OIG agents advised plaintiff that he was subject to disciplinary action.

The OIG agents forwarded the results of their investigation to Singer. Singer then conducted his own investigation. He interviewed supervisors Belton, Zezuto, Annechino, Lamake; and McCauley. Singer interviewed Aramatic staff as well. Belton, Zezuto, Annechino, Lamake, and McCauley denied (1) directing plaintiff to provide the cafeteria with supplies, and (2) having knowledge that plaintiff received free food from the cafeteria. However, Singer learned that other custodial laborers supplied Aramatic with USPS supplies and received free beverages.

On October 27, 2005, Singer conducted an interview/disciplinary hearing of plaintiff. Mendoza accompanied plaintiff, serving in his role as shop steward. Zezuto was also present. That same day, plaintiff was placed on Emergency Off Duty Status; and was suspended without pay. On November 8, 2005, Zezuto, by letter, advised plaintiff that his actions violated the Employee and Labor Relations Manual ("ELM"). He found that plaintiff's use of USPS supplies for personal gain was "so egregious as to warrant" removal from his post. Said letter served as plaintiff's formal notice of removal.

Plaintiff opposed his removal by an affidavit dated November 17, 2005. Plaintiff re-asserted that his supervisor instructed him to provide maintenance supplies to Aramatic. He denied any wrongdoing. Plaintiff also denied receiving a handbook or written materials describing prohibited conduct of USPS employees.

In connection with plaintiff's grievance, in November of 2005, Singer received a statement from Raus affirming that McCauley had instructed the custodians to provide the cafeteria manager with whatever supplies he needed.  On November 23, 2005, plaintiff's union, the American Postal Workers Union, submitted its position regarding plaintiff's removal.  The union posited that plaintiff "[wa]s being removed without just cause."  The union wrote, "Management has failed to make . . . clear . . . that no items were suppose [sic] to be given to the cafeteria manage [sic].  This is clearly a violation of the just cause provision."

Nevertheless, on December 9, 2005, Singer removed plaintiff from his employment at the USPS, effective December 16, 2005.  Singer noted that plaintiff knew, from his orientation trainings, of his obligation to not use USPS supplies for personal gain.  He further noted that plaintiff's original statement to the OIG investigators that no supervisor was aware of his actions aligned with the supervisors' statements regarding his conduct.  Singer thus dismissed plaintiff's claim that McCauley told him to supply the cafeteria with whatever it needed.  Singer also noted that plaintiff previously stole from the USPS and was held criminally responsible.  No other custodial laborer was disciplined or reprimanded or investigated for said activity other than plaintiff.  Kolitsopovlos was the only other person disciplined.  He was relieved of his duty as manager at the Aramatic cafeteria.

At the time of plaintiff's deposition on February 23, 2009, plaintiff believed that Kubis was still on the USPS' payroll despite the embezzlement charge.  Plaintiff contends that his own termination reflects Singer's racial animus because (1) Kubis, a white man, remained on the payroll despite the embezzlement charge, whereas (2)

plaintiff, a black man, was terminated for providing supplies to the cafeteria and receiving free foods, but other custodians were not similarly disciplined.

On January 28, 2006, plaintiff filed a complaint with the USPS Equal Employment Opportunity ("EEO") office. He alleged that Singer discriminated against him on the basis of race and age. The parties were unable to resolve plaintiffs claims during a mediation on April 4, 2006. After a complete investigation, the EEO submitted a report, concluding that Singer did not terminate plaintiff for discriminatory reasons. On May 5, 2006, plaintiff filed a formal complaint with the EEOC, stating that the USPS terminated his employment for discriminatory reasons. Specifically, plaintiff alleged that he was terminated because of his race and age. On September 1, 2006, the EEOC issued a Final Notice of Decision denying plaintiff's mixed claims of discrimination. Plaintiff subsequently filed the present action on December 4, 2006.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FRCP 56(c). "It is the movant's burden to show that no genuine factual dispute exists, and all reasonable inferences must be drawn in the non-movant's favor." Giannullo v. City of New York, 322 F.3d 139, 140 (2d Cir. 2003) (citations omitted). Summary judgment must be denied, therefore, if the court finds "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, 477 U.S. 242, 250 (1986). However, where a plaintiff fails to establish an

essential element of his claim, "there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986) (internal quotations and citations omitted).

Caution should be exercised in addressing summary judgment motions in discrimination cases where intent and state of mind are at issue because "careful scrutiny of the factual allegations may reveal circumstantial evidence to support the required inference of discrimination." See Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000) (citations omitted). Nonetheless, the Second Circuit has expressly "remind[ed the] district courts that the impression that summary judgment is unavailable to defendants in discrimination cases is unsupportable." See Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000) (quotation and citation omitted). On the one hand, mere conclusory allegations of discrimination will not defeat a summary judgment motion; a plaintiff in a discrimination case must proffer "concrete particulars" to substantiate his claim. See Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985). On the other hand, courts must be aware of the fact that "discrimination will seldom manifest itself overtly." Bickerstaff v. Vassar Coll., 196 F.3d 435, 448 (2d Cir. 1999). Courts must therefore "carefully distinguish between evidence that allows for a reasonable inference of discrimination and evidence that gives rise to mere speculation and conjecture." Id. Thus, the ultimate question in deciding a summary judgment motion in a discrimination case "is whether the evidence can reasonably and logically give rise to an inference of discrimination under all of the circumstances." Id.

**III.  LOCAL RULE 56.1**

Local Rule 56.1 of the United States District Courts for the Southern and Eastern Districts of New York requires that the moving party must "submit a statement of the allegedly undisputed facts on which the moving party relies, together with citation to the admissible evidence of record supporting each such fact." Giannullo, 322 F.3d at 140 (citing Local Rule 56.1(a), (d)).  A party opposing a motion for summary judgment should likewise submit a statement of "*additional* material facts as to which it is contended that there exists a genuine issued to be tried."  Local Rule 56.1(b) (emphasis in the original).  If the opposing party does not specifically controvert the moving party's statements, said statements "will be deemed to be admitted."  Local Rule 56.1(c).  However, the opposing party's failure to controvert facts does not absolve the moving party of its burden of proof.  Giannullo, 322 F.3d at 140 (citing Holtz v. Rockefeller & Co., 258 F.3d 62, 74 (2d Cir. 2001)).  Thus, if the moving party makes "unsupported assertions," the court must disregard them and independently review the record.  Id. (citing Holtz, 258 F.3d at 74).

Here, defendant submitted statements of fact pursuant to Local Rule 56.1 and submitted admissible evidence to support said facts.  Plaintiff did not controvert defendant's facts.  Thus, the Court deems defendant's statement of facts to be admitted by plaintiff.

**IV.  TITLE VII CLAIMS**

In the present case, plaintiff alleges that (1) Kubis and Singer discriminated against him because he is black; and (2) the USPS has a pattern and practice of treating black men differently than other USPS workers.  Title VII forbids an employer

11

from discriminating against an employee or applicant for employment "with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). "Title VII 'proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation.'" Gulino v. N.Y. State Educ. Dep't, 460 F.3d 361, 382 (2d Cir. 2006) (citing Griggs v. Duke Power Co., 401 U.S. 424, 431 (1971)). In the absence of direct evidence of discrimination, courts analyze claims brought under Title VII pursuant to the three-step burden shifting analysis set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973). See Schnabel v. Abramson, 232 F.3d 83, 87 (2d Cir. 2000). Under the McDonnell-Douglas framework, plaintiff must first establish a prima facie case of discrimination by demonstrating that: (1) he belongs to a protected class; (2) he suffered an adverse employment action; (3) he was performing his duties satisfactorily; and (4) the circumstances surrounding the employment action give rise to an inference of discrimination. See Dawson v. Bumble & Bumble, 398 F.3d 211, 216 (2d Cir. 2005).

If the plaintiff establishes his prima facie case, a presumption that the employer unlawfully discriminated against the employee is raised and the burden of production then shifts to the employer "to articulate some legitimate nondiscriminatory reason" for its actions. See Fisher v. Vassar College, 114 F.3d 1332, 1335-36 (2d Cir. 1997) (en banc). "The employer's explanation must be clear and specific, so that the employee has an opportunity to demonstrate pretext." Hill v. Taconic Dev. Disabilities Serv. Office, 181 F. Supp. 2d 303, 317 (S.D.N.Y. 2002).

"Should the defendant carry this burden, the plaintiff must then demonstrate that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." Id. See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507-08 (1993). In determining whether the plaintiff has met this burden, the court must take a "case-by-case" approach that weighs "'the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports [or undermines] the employer's case.'" James v. New York Racing Ass'n, 233 F.3d 149, 156 (2d Cir. 2000) (quoting Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 148-49 (2000)). In other words, although the burden of production shifts, "the ultimate burden rests with the plaintiff to offer evidence sufficient to support a reasonable inference that prohibited [age, gender, race or national origin] discrimination occurred." Woodman v. WWOR-TV, Inc., 411 F.3d 69, 76 (2d Cir. 2005) (quotation and citation omitted).

### A.  Intentional Discrimination (Disparate Treatment)[6]

Plaintiff contends that Kubis wrote the August 2005 anonymous letter to the USPS, accusing him of misdeeds, because plaintiff is black. However, plaintiff submits no evidence demonstrating that Kubis wrote the letter, or that the author wrote the letter for discriminatory purposes. Plaintiff only states that he "believes" Kubis wrote the letter, based on his own feelings and what other custodial workers thought. Said bare allegation is insufficient to withstand summary judgment.

---

[6] Intentional discrimination claims are also called "disparate treatment" claims. Ricci v. DeStefano, 129 S.Ct. 2658, 2672 (2009).

13

Plaintiff also contends that Singer singled him out for disciplinary action for providing supplies to Aramatic in exchange for free beverages and food because he is a black man.  Plaintiff states that other custodians provided supplies to Aramatic and received free beverages, but suffered no disciplinary action as a result of the exchange.  However, plaintiff offers no evidence that he was terminated under circumstances giving rise to an inference of discrimination.  Plaintiff baldly asserts that Singer harbored racial animus towards him and other black employees, but points to no specific instance in which Singer displayed said racial animus.  Moreover, plaintiff's contention that Kubis, a white employee, received different treatment for stealing from the USPS is unfounded.  Singer issued a proposed notice of removal to Kubis, as he did to plaintiff.  Thus, plaintiff fails to submit evidence linking his termination to his race.  See Hawana v. City of New York, 230 F. Supp. 2d 518, 527-28 (S.D.N.Y. 2002) (personal, conclusory assumptions are insufficient to support an inference of discrimination).

Finally, even if plaintiff had met his burden of proof on his discrimination claim, defendant articulated legitimate nondiscriminatory reasons for terminating him.  In terminating plaintiff, Singer noted that plaintiff: (1) previously stole from the USPS; (2) made inconsistent statements during the investigations of his misconduct; and (3) knew of the USPS' policy that employees could not use USPS supplies for personal gain.  Plaintiff was previously criminally charged for stealing from the USPS.  Plaintiff does not explain the discrepancies in his statements that (1) McCauley told the custodians to provide supplies to Aramatic versus (2) none of the supervisors knew that the custodians provided said supplies.  He admits that he received training and was aware of the USPS' employment policies.

As such, plaintiff has not submitted direct evidence showing, or indirect evidence giving rise to, an inference of discrimination in violation of Title VII's prohibited employment practices. Simply stated, plaintiff has not submitted evidence of discrimination by Kubis or Singer. Accordingly, it is respectfully recommended that plaintiff's Title VII claims against Kubis and Singer should be dismissed.

### B. Pattern or Practice Claims

Plaintiff also alleges that the USPS has a pattern and practice of treating black men differently than other USPS workers. Pattern or practice discrimination claims focus on widespread acts of intentional discrimination against individuals. United States v. City of New York, 631 F. Supp. 2d 419, 425 (quoting Robinson v. Metro-North Commuter R.R. Co., 267 F.3d 147, 158 (2d Cir. 2001)). However, "individuals cannot maintain a private, non-class, pattern-or-practice claim." Id. (citing numerous cases). Thus, plaintiff has not stated an actionable pattern or practice claim against the USPS. Accordingly, it is respectfully recommended that plaintiff's Title VII pattern or practice claim should be dismissed.

## V. REMAINING CLAIMS

### A. 42 U.S.C. § 1981, 1983 and New York State Laws

As an initial matter, plaintiff alleges causes of action pursuant to 42 U.S.C. § 1981, 42 U.S.C. § 1983, and New York State Laws based on the same facts giving rise to his Title VII claims. However, Title VII is "the exclusive judicial remedy for claims of discrimination in federal employment." Brown v. Gen. Servs. Admin., 425 U.S. 820, 835 (1976); Briones v. Runyon, 101 F.3d 287, 289 (2d Cir. 1996) (citations omitted). Here,

plaintiff's race discrimination claims arise from his employment by the federal government. As such, he may only assert said claims pursuant to Title VII. See, e.g., Rivera v. Heyman, 157 F.3d 101, 105 (2d Cir. 1998) (dismissing NYHRL claims arising from federal employment); Lewis v. Snow, No. 01 Civ. 7785, 2003 WL 22077457, at *9 (S.D.N.Y. Sept. 8, 2003) (dismissing 42 U.S.C. § 1981 claims arising from federal employment); Marshall v. Nat'l Assoc. of Letter Carriers Br. 36, Nos. 00 Civ. 3167, 01 Civ. 3086, 2003 WL 223563, at *6 (S.D.N.Y. Feb. 3, 2003) (dismissing plaintiff's "non-Title VII statutory and common law" race discrimination claims arising from federal employment). Thus, it is respectfully recommended that plaintiff's 42 U.S.C. § 1981, 42 U.S.C. § 1983, and New York State Laws claims should be dismissed.

### B. ERISA

Plaintiff also alleges that defendant terminated him with the intent to deprive him of his retirement benefits in violation of ERISA. However, ERISA's provisions do not apply to employee benefit plans which are governmental plans, such as the USPS' retirement plan at issue here. See 29 U.S.C. §§ 1002(32), 1003(b). Thus, it is respectfully recommended that plaintiff's ERISA claim should be dismissed.

## VI. CONCLUSION

For all of the foregoing reasons, I conclude, and respectfully recommend that defendant's motion for summary judgment should be GRANTED in full, and all of plaintiff's claims should be dismissed.

## VII. NOTICE

Pursuant to 28 U.S.C. § 636(b)(1)(B), as amended, and Rule 72(b), Fed. R. Civ. P., the parties shall have fourteen (14) days from receipt of this Report to serve and file written objections to this Report and Recommendation. If copies of this Report are served upon the parties by mail, the parties shall have seventeen (17) days from receipt of this Report to file and serve written objections. See Fed. R. Civ. P. 6(d). Such objections, if any, shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of The Honorable Stephen C. Robinson at the United States District Court, Southern District of New York, 300 Quarropas Street, White Plains, New York, 10601, and to the chambers of the undersigned at said Courthouse.

Failure to file timely objections to this Report and Recommendation will preclude later appellate review of any order of judgment that will be entered. See Caidor v. Onondaga County, 517 F.3d 601, 604 (2d Cir. 2008).

Requests for extensions of time to file objections must be made to the Honorable Stephen C. Robinson and not to the undersigned.

Dated: May 27, 2010
   White Plains, New York

Respectfully Submitted:

_____
GEORGE A. YANTHIS, U.S.M.J.